UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MDG INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:07-cv-1096-SEB-TAB |
| vs. | ) | |
| | ) | |
| AUSTRALIAN GOLD, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ADDRESSING MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the court on Defendant, Australian Gold, Inc.'s ("Australian Gold") Motion for Partial Summary Judgment on South Africa and the United Arab Emirates [Docket No. 37], filed on April 8, 2008; Australian Gold's Motion for Partial Summary Judgment on Mexico [Docket No. 39], filed on April 15, 2008; Australian Gold's Motion for Partial Summary Judgment on Cruise Ship Sales [Docket No. 97], filed on November 7, 2008; and Australian Gold's Motion for Partial Summary Judgment on MDG's Claim for Damages Arising from the Brazilian Recall [Docket No. 99], filed on November 7, 2008.

In the case at bar, Plaintiff, MDG International, Inc. ("MDG"), claims that Australian Gold breached the parties' initial contract by marketing products to competitors, including Starboard Cruise Services, and that Australian Gold committed fraud when it misled MDG about expiration dates on Australian Gold products.  In its motions, Australian Gold contends that summary judgment should be entered against

MDG on all claims arising out of purported South Africa and UAE contracts; the parties'

contract in Mexico; Australian Gold's relationship with Starboard Cruise Services; and

the recall of expired products in Brazil.  For the reasons detailed in this entry,

Defendant's Motion for Partial Summary Judgment on South Africa and the United Arab

Emirates is <u>GRANTED</u>; Defendant's Motion for Partial Summary Judgment on Mexico is

<u>DENIED</u>; Defendant's Motion for Partial Summary Judgment on Cruise Ship Sales is

<u>GRANTED</u>; and Defendant's Motion for Partial Summary Judgment on Brazil Recall is

<u>GRANTED</u> in part and <u>DENIED</u> in part.


### ***<u>Factual Background</u>***

Plaintiff MDG is a corporation organized under the laws of Florida with its

principal place of business in Florida.  Defendant Australian Gold is a corporation

organized under the laws of Indiana with its principal place of business in Indiana.  MDG

distributes sun tanning products internationally; Australian Gold manufactures tanning

products that it sells through distributors like MDG.  On May 27, 1994, MDG and ETS

(the corporate predecessor to Australian Gold) entered into a distributorship agreement

("the Agreement") to which Australian Gold is now a party.[1]

The Agreement granted MDG the exclusive rights to market, distribute, and sell

Australian Gold products in defined territories, including South America, Mexico, Israel,

---

[1]On November 1, 1997, ETS assigned its rights under the agreement to Australian Gold.

Puerto Rico, and the Caribbean islands.[2]  The initial term of the Agreement lasted from September 23, 1993 to December 31, 1994.  Thereafter, the Agreement renewed on an annual basis as to each territory, provided each party performed its part of the contract.[3]

### I. Distributorship in South Africa and the UAE

Although South Africa was not mentioned in the Agreement, on July 6, 1995, Australian Gold sent a letter to MDG proposing the appointment of MDG as Australian Gold's exclusive distributor in South Africa.  That letter stated:

> Please accept this letter as a confirmation of our intention to appoint [MDG] as the exclusive distributor of Australian Gold Tanning Products in the country of South Africa.  This appointment will be based on a mutually agreed upon quota assignment for this territory, and such quotas will be included in a contractual rider to be executed by July 30, 1995.

The "contractual rider" mentioned was never executed, nor were any quotas, or any other terms, established.  MDG has never sold an Australian Gold product in South Africa.

On May 14, 2001, Australian Gold sent a second letter to MDG, this one regarding the appointment of MDG as Australian Gold's exclusive distributor in the UAE:

> Please accept this as notification of our appointment of [MDG] as exclusive distributors of Australian Gold [products] to the . . . The United Arab Emirates . . . .  Addendums to your legal contracts are being prepared.

No "addendums" were ever executed by the parties, nor were any other terms prepared or

---

[2]The Agreement did not give MDG exclusive rights in South Africa or the United Arab Emirates ("UAE").

[3]The Agreement included a requirement that MDG meet a minimum purchase requirement, or quota, for each territory.

established.

## II. Distributorship in Mexico

The Agreement executed on May 27, 1994, gave MDG the exclusive right to sell, market, and distribute Australian Gold products in Mexico. The minimum purchase requirement ("Mexico quota") during the Agreement's initial term was 106,000 units.[4] Under the Agreement, each year, the Mexico quota increased to 110% of the preceding year's quota. In 2007, the Mexico quota was 332,673 units, but MDG purchased only 250,680 units for sale in Mexico that year.[5]

Although the Agreement established this specific quota, for fourteen years, Australian Gold only requested, and MDG only reported, information on total overall sales for all territories, never break-down calculations of specific territory sales. Moreover, Australian Gold never mentioned nor complained to MDG that MDG had failed to meet a territory quota. However, on February 12, 2007, Australian Gold notified MDG that MDG would be required to provide an accounting of its 2007 sales by territory. On April 14, 2008, Australian Gold notified MDG that it allegedly had failed to meet the Mexico quota for 2007.

---

[4] A "unit," as defined by the Agreement, is a "bottle or tube of tanning lotion manufactured and sold under the name 'Australian Gold.'" Def.'s Br. in Supp. at 2.

[5] Australian Gold argues that the 110% increase began with the initial term, but MDG argues that the 106,000 unit quota was maintained for the second term. Under Australian Gold's theory, the 2007 Mexico quota was 365,941 units; under MDG's calculation, the 2007 quota was 332,673. MDG has shown that it asked for and received a waiver of the annual quota increase in 1995, so we shall treat 332,673 as the Mexico quota for 2007.

### III.  Cruise Ship Sales

During the course of the Australian Gold-MDG business relationship, Australian Gold also had a separate distribution and sales agreement with Starboard Cruise Services, which operates gift shops on cruise liners worldwide, including in the Caribbean Sea. Starboard sells Australian Gold products to ship passengers while the ships are in international waters.  Nevertheless, because many of these ships dock at the ports of countries inside MDG's exclusive territory, MDG argues that Australian Gold's agreement with Starboard violated MDG's exclusive rights and thus was a breach of the Australian Gold-MDG Agreement.

### IV.  The Brazil Recall

The Agreement also gave MDG exclusive rights to sell, market, and distribute Australian Gold products in South America, including the country of Brazil.  In 2004, MDG began working with Frajo Internacional de Cosméticos ("Frajo"), through its owner, Frank Lund, with the aim of creating a joint venture for the distribution of Australian Gold products in Brazil.  In 2006, Australian Gold and MDG recalled certain products from the Brazil market because those products were expired or would soon expire (the "Brazil Recall").   MDG has brought claims for expenses and lost profits, as well as fraud claims, for damages allegedly resulting from the Brazil Recall.

## *Legal Analysis*

### *I.  Standard of Review*

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  <u>See id.</u> at 255. However, neither the "mere existence of some alleged factual dispute between the parties," <u>id.</u> at 247, nor the existence of "some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  <u>Michas v. Health Cost Controls of Illinois, Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  <u>Id.</u> at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle

for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enter., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

## II.  *Australian Gold's South Africa and UAE Letters*

Australian Gold argues first in its motion for summary judgment that any claim MDG has brought relating to South Africa and the UAE is foreclosed because no contract was ever formed as to either territory.[6]  Under Indiana law, "the existence or nonexistence of a contract turns on whether material terms are missing."  Mays v. Trump Ind., Inc., 255 F.3d 351, 358 (7th Cir. 2001); see also E. Natural Gas Corp. v. Aluminum Co. of Am.,

---

[6]MDG attached a letter to its Response to Australian Gold's Motion for Partial Summary Judgment on Mexico, in which MDG stated that it no longer wished to be a distributor in South Africa or the UAE.  Citing this letter, MDG states that it does not wish to pursue its claims related to those territories.  Ordinarily, we would not need to resolve a claim that a party abandons.  However, because of the unorthodox way that MDG sought to close its claim, by letter rather than by pleading or brief, we feel a need to make clear that no such claim passes muster.  Because at least one claim shall remain after this summary judgment ruling, we want the record to plainly reflect that the South Africa and UAE contracts are not viable.

126 F.3d 996, 1002 (7th Cir. 1997) ("A letter that does not contain definite and specific terms, and that is contingent upon further negotiations and execution of a final agreement, is not a contract under Indiana law.").

In the case at bar, Australian Gold argues that "[t]he South Africa Letter's contemplation of future negotiation of key terms renders it an unenforceable agreement to agree." Def.'s Br. in Supp. at 7. The appointment of MDG as distributor for South Africa "was expressly dependent upon an agreed quota" and numerous other anticipated terms, none of which was never established. Def.'s Br. in Supp. at 8. Because the letter lacked "essential terms," and left almost the entire agreement "still to be nailed down," no contract was ever formed as to distribution in South Africa. Mays, 255 F.3d at 358.

Like the South Africa letter, the UAE letter contained no terms relating to quotas, payment, shipping, confidentiality, or renewal. Under the rule of Mays, "[t]he question of whether an agreement is an enforceable . . . contract or merely an agreement to agree involves two interrelated areas: intent to be bound and definiteness of terms." Id. (quoting Wolvos v. Meyer, 668 N.E.2d 671, 675 (Ind. 1996)). Although the UAE letter stated, "please accept this notification of our appointment of MDG," it could not have been more indefinite as to the terms of the purported agreement. Moreover, there is no evidence that MDG ever treated this contract as formed; MDG has never sold an Australian Gold product in the UAE. Therefore, we conclude that the parties did not intend to be bound and that no such contract ever existed.

Australian Gold also argues that any purported contracts relating to South Africa and the UAE are nullified because "MDG's failure to use its best efforts has breached any

agreement created by the letters." Def.'s Br. in Supp. at 11. "A lawful agreement by either the seller or the buyer for exclusive dealing . . . imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." Ind. Code §26-1-2-306(2); see also Gen Beverage Sales Co. - Oshkosh v. E. Side Winery, 396 F.Supp. 590, 593-4 (E.D. Wis. 1975). MDG has never made any effort to promote the sale of Australian Gold products in South Africa or the UAE. Therefore, assuming *arguendo* that the letters created contracts between the parties, we conclude that MDG breached any contract related to South Africa and the UAE. See Breeding v. Kye's Inc., 831 N.E.2d 188, 191 (Ind. Ct. App. 2005). For all of the foregoing reasons, Australian Gold's Motion for Partial Summary Judgment as to South Africa and the UAE is granted.

### III. *Australian Gold's Motion for Partial Summary Judgment on Mexico*

Australian Gold contends that the Agreement as to Mexico was automatically canceled because MDG did not meet the Mexico quota for 2007. MDG responds that Australian Gold's enforcement of the Mexico quota and its reliance on that quota to claim a breach by MDG is barred by "factual disputes which are underpinned by the doctrines of waiver, estoppel, and prevention of performance under Indiana law." Pl.'s Response at 1-2.

#### A. *Waiver and Estoppel*

"Waiver is an intentional relinquishment of a known right involving both

knowledge of the existence of the right and the intention to relinquish it." Rogier v. American Testing and Engineering Corp., 734 N.E.2d 606, 620 (Ind.Ct.App. 2000). According to MDG, because Australian Gold did not calculate the quota requirements for any territory until 2005 (fourteen years after the execution of the Agreement), it waived its right to enforce those individual requirements. Under Indiana law, "mere silence, acquiescence or inactivity is not waiver unless there was a duty to speak or act." Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis, 723 F.2d 512, 518 (7th Cir. 1983) (citations omitted). MDG points to no duty on Australian Gold's part to inform its distributors of the decision to enforce the quotas. That Australian Gold had no such duty is reinforced by the existence of a non-waiver clause in the Agreement: "No failure or delay by either party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any right, power or privilege hereunder." Agreement ¶7.7. It is clear from this clause and the rule as stated in Canada Dry that Australian Gold has not waived its contractual right to enforce territorial quotas.

MDG argues, in the alternative, that if Australian Gold has not waived the right, estoppel should nonetheless bar Australian Gold from enforcing quotas. Estoppel may be available when waiver is not. See Crocker Commercial Services, Inc. v. Countryside Bank, 538 F.Supp. 1360, 1364 (N.D. Ill. 1981). Moreover, courts assess a party's silence differently under an estoppel theory than under a waiver theory: "silence and acquiescence, when good faith requires a person to speak or act, are, in the matter of estoppel, equivalent to express affirmation." Canada Dry, 723 F.2d at 518 (quoting Bahar

v. Tadros, 112 N.E.2d 754, 760 (Ind.Ct.App. 1953)).

"Estoppel is a judicial doctrine sounding in equity.  Although variously defined, it is a concept by which one's own acts or conduct prevents the claiming of a right to the detriment of another party who was entitled to and did rely on the conduct."  Brown v. Branch, 758 N.E.2d 48, 51-52 (Ind. 2001) (citing In re Edwards, 694 N.E.2d 701, 715 (Ind. 1998)).  All varieties of estoppel "are based on the same underlying principle: one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other."  Id.; see also Martin Marietta Materials, Inc. v. Brainard, 2007 WL 4232184 (S.D. Ind. 2007).  For fourteen years, Australian Gold required MDG only to calculate overall sales figures.  Responding to this, MDG structured its business efforts toward generating overall sales, not toward meeting particular quotas.  This reliance, MDG contends, should bar Australian Gold from enforcing those quotas.

According to Australian Gold, because MDG had notice that the terms of the Agreement would be enforced, it was not unfair to enforce the quota.  "A party who has made a waiver . . . may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."  Ind. Code § 26-1-2-209(5).  Australian Gold notified MDG of its intent to enforce the 2007 Mexico quota in a letter sent to MDG's counsel in early 2007.  MDG contends that this notice was not reasonable because MDG was not afforded sufficient time to restructure its business efforts, which it had adopted in reliance on Australian Gold's silence.

Australian Gold counters that MDG's bare allegation that it "'would have deployed its efforts in a different fashion' . . . cannot create a question of fact to defeat summary judgment."  Def.'s Reply at 9 (quoting Pl.'s Response at 16).  MDG argues, however, that it has, in fact, made additional efforts, and it has presented evidence showing a sharp increase in Mexico sales in 2007.[7]  The parties dispute whether the notice was timely; whether MDG materially changed its position in reliance on Australian Gold's fourteen-year silence; whether MDG made efforts to meet the quota after the February 12, 2007 notice; and whether further efforts would have enabled MDG to meet the quota.  A jury might reasonably find in either party's favor on this question.  When assessing estoppel, a court must keep in mind that it is an "equitable principle used by courts to avoid harsh results when a party has conducted itself in such a way as to make those results unfair."  Shearson Hayden Stone, Inc. v. Leach, 583 F.2d 367, 370 (7th Cir. 1978).  It would be unfair to permit Australian Gold to enforce this quota, which it concedes lay dormant for fourteen years, in light of these genuine factual disputes.  Thus, Australian Gold's Motion for Partial Summary Judgment on Mexico must be denied.

## B.  Prevention of Performance

MDG asserts an alternative reason it believes summary judgment must be denied as to Mexico.  According to MDG, if it is found to have failed to meet the Mexico quota,

---

[7]Australian Gold alleges that MDG never informed Graphic Communications, MDG's only customer in Mexico, that MDG was required to meet a territorial quota in Mexico in 2007. The evidence indicates, however, that MDG increased its 2007 sales in Mexico by at least 82,000 units over its 2005 and 2006 sales.

that failure was caused by the actions of Australian Gold, not its own failed sales efforts.

"It is well established that where the actions or conduct of one party to a contract prevent

the other from performing his part, the other's non-performance will be excused."

Maddox v. Wright, 489 N.E.2d 133, 137 (Ind.Ct.App. 1986).  MDG contends that

"Australian Gold has interfered with MDG's order and sale of products in the following

ways: (1) failing to fill MDG's orders in a timely manner and allowing backorders to

accumulate; (2) failing to offer newly introduced products for sale to MDG in 2007; and

(3) failing to manufacture products in the 4.22 ounce bottle size in 2007."  Pl.'s Response

at 20.  MDG alleges that, if Australian Gold had not failed to perform its part of the

bargain in these three respects, "it could have sold at least 55,212 more units in Mexico in

2007," in addition to "an assumed 20,000 or more of newly introduced products, and

10,224 more units of 4.22 ounce products," totaling 85,436 units, which would have

enabled MDG to meet the Mexico quota.  Id.[8]

The first disputed issue is whether back orders, or product delays, caused MDG to

lose sales in Mexico.  MDG argues, and presents evidence to show, that 28,164 units

were delayed because of back orders, and another 27,048 units were canceled entirely.

MDG has sufficiently created a genuine issue of fact as to whether the 27,048 canceled

units equated to lost sales.[9]  Australian Gold argues, however, that the 28,164 delayed

---

[8]Additionally, MDG argues that sales of Australian Gold products at Starboard gift shops on cruise ships wrongfully overlapped with MDG's Mexico territory, thereby negatively impacting MDG's ability to sell in Mexican ports.

[9]Mauricio Goldring, MDG's president, testified that Graphic Communications, MDG's only customer in Mexico, canceled its order for this many units because of product delays.

(continued...)

sales did not ultimately result in lost sales for MDG because those units were eventually

sold.  Moreover, Australian Gold asserts that it has credited MDG 28,164 sales for 2007

to cover this shortfall, and it insists that counting these delayed sales again would give

MDG "double credit."  Even if this credit was given, however, it is still unclear whether

that sufficiently accounted for the effect of the delay.

An officer of Australian Gold characterized each back order as a "missed

*opportunity*" for a sale, not a lost sale that can simply be replaced by a later sale, which

indicates that double counting of these units may be proper.  Dep. of Chris Shaffer, pg. 44

(emphasis added).  Furthermore, the officers of Graphic Communications, MDG's

customer in Mexico, provided inconsistent opinions on this matter.[10]  The record therefore

contains contradictory evidence as to whether the delayed sales resulted in additional lost

sales.  Thus, a genuine question exists as to whether Australian Gold's product delays

prevented MDG from achieving its maximum sales and thereby meeting the Mexico

quota.

Next, we address MDG's contention that sales were lost because it was not offered

---

[9](...continued)
Goldring Dep. at ¶15.  This, in the face of Australian Gold's unconvincing argument to the
contrary, suffices to create a genuine issue of material fact.

[10]Jorge and Eduardo Macari are the co-owners of Graphic Communications.  Jorge
Macari stated that the elimination of shipping delays would not have resulted in additional orders
to MDG.  Aff. of Jorge Macari, ¶¶14-16.  However, Eduardo Macari communicated to MDG that
delays caused Graphic Communications to miss the opportunity to sell the maximum number of
Australian Gold products because the delays occurred during the busy tourist season.  Aff. of
Cisneros, pg. 1.

new products in 2007.[11]  Mauricio Goldring, MDG's president, estimated that MDG would have sold 20,000 units of the new products in 2007.  Mr. Goldring based his estimate on his experience introducing new products in Mexico.  Australian Gold argues that his estimate is "entirely speculative," but Australian Gold does not offer convincing evidence refuting Mr. Goldring's experience and capacity to make this estimation.  His many years managing MDG, including 2007, certainly provide him with sufficient personal knowledge to opine this figure and create a genuine issue of fact.  This conclusion is supported by the fact that in January 2007, Graphic Communications expressed its interest in purchasing the new products from MDG.  Pl.'s Sur-Reply at 14.[12] Thus, there is a reasonable probability that MDG would have sold some quantity of the new product in 2007, and a genuine issue of material fact exists as to the impact of Australian Gold's decision not to offer the product.

The final factual dispute regards whether lost sales can be attributed to Australian Gold's decision to halt production of 4.22-ounce bottles of certain products.  According to Australian Gold, it suspended production of these bottles because MDG had ordered fewer of them in 2006.  MDG argues that this led to 10,224 lost sales, which is the amount Graphic Communications ordered after production ceased.  MDG has presented

---

[11]In 2007, Australian Gold introduced a new aerosol "continuous spray" deliver system for some of its products.

[12]Furthermore, Australian Gold's stated reason for not offering the product to MDG is unconvincing.  Australian Gold says that it only offered the products to domestic distributors because it did not want to undertake the responsibility of shipping the new products, which were more hazardous than existing products, to international shippers.  However, we were informed that Australian Gold ships to MDG's warehouse in Miami, Florida.

sufficient evidence of these lost sales to create a genuine issue of fact.[13]

In 2007, MDG fell 81,993 units short of the Mexico quota.  A jury might reasonably conclude that MDG was prevented from selling 55,212 units arguably lost because of back order problems; 20,000 estimated units arguably lost because of Australian Gold's decision not to offer the new product line to MDG; and 10,224 units lost because Australian Gold decided to halt production of 4.22-ounce bottle products. These add up to 85,436 additional sales, which might have enabled MDG to meet the 2007 Mexico quota.  Given the possibility that MDG would have met the Mexico quota had Australian Gold not made these decisions and created these delays, we conclude that Australian Gold's Motion for Partial Summary Judgment must be <u>denied</u>.

### IV. *Australian Gold's Motion for Partial Summary Judgment on Cruise Ship Sales*

Australian Gold also seeks partial summary judgment against MDG on its claim that sales of Australian Gold products to Starboard Cruise Services represent a breach of the Agreement.  Starboard operates duty free gift shops, which sell Australian Gold products, on cruise ships all over the world.[14]   When Starboard orders Australian Gold products, Australian Gold delivers them to Starboard's warehouse in Miami, Florida.

---

[13]MDG also argues that sales in Starboard gift shops on cruise ships that dock in Cozumel, Mexico should be considered as impairing MDG's ability to meet its quota.  Below, we conclude that Australian Gold's agreement with Starboard was not a breach of its exclusivity agreement with MDG.  However, that issue is separate from the issue of whether the Australian Gold-Starboard relationship was significant enough to meaningfully impair MDG's ability to meet the quota.  Therefore, this too creates a genuine issue of material fact.

[14]Starboard operates gift shops on eighty-four cruise ships, forty-nine of which have flag registrations in Panama or the Bahamas, which are part of MDG's exclusive territory.

Starboard's gift shops are only open for business when the ships are sailing in international waters, never when they are in a port or in territorial waters.[15]  Starboard places catalogs, which advertise Australian Gold products alongside other merchandise, in each ship's passenger cabins before passengers arrive on the ship.

According to MDG, Australian Gold breached the Agreement by permitting Starboard's business to overlap geographically with MDG's exclusive territories.  MDG posits four bases for this argument: (1) "Since cruise ship passengers could presumably browse these catalogs at any time (not just while the ship was in international waters), . . . Starboard *marketed* Australian Gold products in ports and territorial waters of countries within MDG's territories,"  Pl.'s Response at 8 (emphasis added); (2) "Australian Gold permitted Starboard to *distribute* its products in MDG's territories [because] . . . Starboard regularly delivers products to ports located" in MDG's territories, id. (emphasis added); (3) "The Distributorship Agreement, broadly construed, conveys a mutual understanding and obligation between the parties to respect each other's territorial rights and not intentionally interfere," id. at 9; and (4) Starboard's sales on certain ships actually occurred within MDG's territory, under the Law of the Flag.  Id. at 11.

The first two arguments are based on the language of the Agreement.  Under Indiana law, contract interpretation is a question of law to be decided by the Court.  Dunn

---

[15]When a ship is sailing in territorial waters, Starboard gift shops are sealed by customs officers, to be reopened only when the ship returns to international waters.

v. Meridian Mutual Ins Co., 836 N.E.2d 249 (Ind. 2005).[16]  MDG's first argument, that

Starboard "marketed" products in MDG's territory, is unavailing.  Although the term

"market" is not defined in the original Agreement, the parties, in their briefing, agree that

the term should be defined as "to expose for sale in a market."  Under this plain-language

definition, Australian Gold did not enable Starboard to "market" its products in MDG's

exclusive territories.  Starboard's duty free shops were only open when the cruise ships

were located in international waters.  Therefore, Australian Gold did not expose its

products for sale in any of MDG's territories.[17]

MDG also argues that Starboard "distributed" Australian Gold products inside

MDG territories.  Again, no definition of the term "distributed" is provided in the

Agreement.  If a contract's "terms are clear and unambiguous, courts must give those

terms their clear and ordinary meaning."  Dunn, 836 N.E.2d at 251.  MDG suggests that

the term means "to divide among several or many," but that is too simple for an

agreement about a commercial retail relationship.  Australian Gold proposes this

---

[16]MDG contends that we must construe the contact against its drafter, Australian Gold.
However, when a contract was negotiated at arm's length by sophisticated parties on equal
footing, as it was here, the rule does not apply.  Beanstalk Group, Inc. v. AM Gen. Corp., 283
F.3d 856, 858 (7th Cir. 2002) ("The agreement was drafted by Beanstalk, but this fact has little
significance since AM General is a commercially sophisticated party represented by counsel").
Thus, we shall not construe the contract against either party.

[17]The catalog advertised Australian Gold's products; it did not offer them directly for
sale.  Thus, if a passenger read the catalog while she was in port and decided to purchase one of
the products immediately, she would have no choice but to purchase the product from MDG or
one of its agents, not from Starboard.  If Australian Gold advertised in a general magazine, and a
passenger happened to be reading that magazine inside one of MDG's territories and then
decided to purchase a product, the effect would have been the same.  This cannot amount to a
violation of MDG's exclusive rights in its territories.

definition: "to promote, sell, and ship or deliver (an item or line of merchandise) to individual customers, esp. in a specified region or area." Webster's Unabridged Dictionary 572 (2d ed. 2001). The American Heritage dictionary offers this: "to supply (goods) to retailers." Both of these accurately capture the term as it relates to an agreement like the one between MGD and Australian Gold.

When Australian Gold sells to Starboard, all products are shipped to Starboard's Miami warehouse. Starboard manages the supply at its duty free shops from there, delivering products to shops in need of inventory. This operation is not "distribution" in the normal commercial sense because Starboard itself is a retailer and is not engaged with any customers. Starboard does not ship products to separate retailers or customers, only to its own stores. When Starboard sends products from Miami to ports in the Caribbean islands, it is merely restocking its own shelves. Because Starboard does not engage in any "distribution," its operations do not overlap with MDG's exclusive distribution rights in MDG's territories.

In addition to these narrower contract-interpretation arguments, MDG also contends that Australian Gold has violated the "spirit" of the Agreement by giving Starboard access to potential MDG customers. MDG asserts that the "spirit " of the contract is "a mutual understanding and obligation between the parties to respect each other's territorial rights and not intentionally interfere." Pl.'s Response at 9.[18]

---

[18]In support, MDG points to the contract itself, which establishes "exclusive" territorial rights, as well as letters sent by Mr. Goldring, in which he expressed his belief that the cruise ship sales violated the Agreement.

We repeat: A contract that is unambiguous in its terms must be interpreted according to those terms:

> When the language of a contract is clear and unambiguous, the intent of the parties is determined from the four corners of the instrument, giving the words contained therein their plain, usual, and ordinary meaning. In such a situation, the terms are conclusive and we will not construe the contract or look at extrinsic evidence, but will merely apply the contractual provisions.

Crawford County Cmty. Sch. Corp. v. Enlow, 734 N.E.2d 685, 690 (Ind.Ct.App. 2000).

We proceed cautiously, therefore, when asked to ascertain and enforce the "spirit" of a contract. In this case, the only evidence presented by MDG in support of its argument comes in the form of a few unanswered letters sent by one of its officers. This unilateral expression does not suffice to demonstrate the agreed-upon, overarching "spirit" of the contract.

The Agreement itself is "clear and unambiguous" as to the intent of the parties, regarding the geographic extent of the exclusive territories, and the nature and extent of MDG's exclusive rights. By ensuring that Starboard would sell Australian Gold products only in international waters, and not in any territorial waters or ports, Australian Gold respected MDG's exclusive rights. Therefore, Australian Gold did not violate the intent of the contract.

Finally, MDG argues that Starboard has actually made sales in MDG's territory under the Law of the Flag doctrine. Under this doctrine, a ship is "deemed to be a part of the territory of that sovereignty whose flag it flies." Lauritzen v. Larsen, 345 U.S. 571, 585 (1953). More than half of Starboard's ships fly either the Panama or Bahamas flag, both of which fall within MDG's territory. According to MDG, when sales are made on

these ships, MDG's territorial rights are violated.

The Law of the Flag is most commonly used for jurisdictional purposes, not to establish sovereignty itself.  See Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306, 308, 313 (1970).  Furthermore, as the Lauritzen Court noted, international waters "cannot be anyone's property."  Lauritzen, 345 U.S. at 583.   In other words, "[t]he law of the flag doctrine does not hold that for all purposes a ship is part of the territory of the country whose flag it flies."  United States v. Streifel, 507 F.Supp. 480, 488 (S.D.N.Y. 1981).  For example, the Supreme Court has held that seamen working on a ship flying the American flag were not thereby working within the territory of the United States: "in the physical sense this expression is obviously figurative, and to expand the doctrine to the extent of treating seamen employed on such a ship as working in the country of its registry is quite impossible."  Scharrenberg v. Dollar S.S. Co., 245 U.S. 122, 127 (1917).  Similarly, the Law of the Flag doctrine cannot be extended in this case to say that sales made on a ship with its registry in Panama actually occurred in Panama.  Thus, MDG's Law of the Flag argument, like its other arguments relating to Starboard's duty free sales of Australian Gold products, is unavailing.

The undisputed facts demonstrate that MDG cannot succeed on its claim that Australian Gold's relationship with Starboard breached the Agreement.  Therefore, Australian Gold's Motion for Partial Summary Judgment on Cruise Ship Sales is granted.


### V. *Australian Gold's Motion for Partial Summary Judgment on the Brazil Recall*

Australian Gold also seeks summary judgment against MDG on MDG's claims for

damages arising from the termination of its business relationship with Frajo, MDG's purported "partner" in Brazil.[19]  Most of MDG's claims against Australian Gold depend on the Brazil Recall having caused the destruction of the Frajo-MDG business relationship.[20]  Australian Gold argues, however, that the agreement between MDG and Frajo fell apart on its own, not because of the Brazil Recall.

According to Frank Lund, the owner of Frajo, MDG "wanted [Frajo] to pay a profit that we said that we didn't have, and it was just too much.  Too much headaches." Dep. of Frank Lund at 55:3-15.  He also stated that he believed many of MDG's claimed expenses arising from the business relationship were "not proper" and that was "[a]lso one of the reasons why [he] ended the relationship with them . . . .  It's not the way to do business."  Id. at 47:13-48:1.  Significantly, Mr. Lund also testified that he intended to continue Frajo's relationship with MDG after the Brazil Recall:

> Q    Were you prepared to continue selling –
> A    Yeah.
> Q    – through MDG at that – when the recall finished?
> A.   Yeah.

Id. at 35:8-13.  MDG argues that Mr. Lund never said MDG was "too difficult to work with," but this argument amounts to little more than a mincing of words.  By MDG's own admission, Mr. Lund did say that MDG was "very difficult to do business with."  Pl.'s

---

[19]In addition to other damages, MDG claims that Australian Gold can be held responsible for money Frajo allegedly owes MDG.  MDG has presented no convincing evidence establishing third-party liability, so Australian Gold's motion is granted as to any such claim.

[20]Frajo and MDG negotiated a joint venture agreement, but the parties never executed a written agreement.

Response at 11. Moreover, MDG concluded in its briefing, "Ultimately, [Mr. Lund] sought to cut MDG out so that he could maximize his profit." Pl.'s Response at 12. Thus, based on either interpretation of these facts, MDG's or Australian Gold's, something other than the Brazil Recall, whether it was Mr. Lund's difficulty working with MDG or his hope for more profit, caused the damage to MDG's business in Brazil.[21] Australian Gold is therefore entitled to summary judgment on any claim of damages arising from the termination of MDG's relationship with Frajo.[22]

_____

[21]In addition to this substantive failing, MDG's argument relies in significant part on inadmissible evidence. "When acting on a motion for summary judgment, the judge [should] consider . . . only evidence that would be admissible at trial." Ace Mortgage Funding, LLC v. Bradford, 2008 WL 687314 at *1 (S.D. Ind. 2008) (quoting McKinney v. Duplain, 463 F.3d 679, 691 n.5 (7th Cir. 2006). A number of documents relating to the calculation of lost profits are inadmissible because they are offered only in a foreign language. Documents in a foreign language are widely considered not properly authenticated. See Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 413 (1st Cir. 2000); Trapaga v. Cent. States Joint Bd. Local 10, 2007 WL 1017855 at *7 (N.D. Ill. 2007); United States v. One 1988 Chevrolet Half-Ton Pickup Truck, 357 F.Supp.2d 1321, 1329 (S.D. Ala. 2005) ("[I]t is clear, to the point of perfect transparency, that federal court proceedings must be conducted in English."). MDG's relies on exhibits LL, MM, RR, WW, and XX, but these have not been translated into English. Therefore, they are not authenticated and are inadmissible.

[22]In addition, MDG's claimed damages are very speculative and unlikely to support a damages award. See McGehee v. Elliot, 849 N.E.2d 1180, 1190 n.2 (Ind. Ct. App. 2006) ("A trier of fact may not award damages on the mere basis of conjecture and speculation."). Mr. Lund testified numerous times that Brazil was too unpredictable a market to be subject to reasonable estimates. E.g., Lund Dep. at 77:14-18. The Brazil forecast is different than Mr. Goldring's estimate of new product sales in Mexico, not only because of Mr. Lund's testimony. Whereas Mr. Goldring relied on his experience of introducing products in Mexico to predict the number that would sell in the first year, Mr. Goldring admitted that he could not use his experience to predict profits in Brazil. Goldring Dep. at 106:12-21. Moreover, whereas in Mexico, a longstanding agreement was in place, in Brazil, the parties had reached no agreement about price, deal structure, or any other terms.

A. *MDG's Claim of Lost Investment and Reputation Damages*

MDG also seeks damages for lost investment and injury to its reputation in South America.  This claim is almost entirely foreclosed because Australian Gold cannot be held responsible for the termination of MDG's relationship with Frajo.  Nevertheless, because Australian Gold may still be held responsible for the Brazil Recall itself, and because the recall may alone have led to the reputation damage, this claim must be dealt with separately.

According to MDG, it "made a substantial investment in developing the market for Australian Gold products in Brazil," in an amount of $235,000  Pl.'s Br. at 10.  MDG argues that "[a]s a result of the recall, MDG lost its reputation and goodwill and therefore lost its investment in the marketplace.  The loss of reputation is self-evident."  Beyond this statement, MDG offers no evidence of any damage to its reputation.  Moreover, Mr. Lund testified that MDG had no contact with any of the customers in Brazil.  Thus, while Frajo's reputation may have suffered, there is no reason to believe that MDG's did.

MDG's evidence relating to lost investments is equally scant, but for different reasons.  Although MDG submitted two "representative invoices" of expenses in Brazil, these documents are partially in Portuguese and are therefore indecipherable by us and thus inadmissible as tendered.  See Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 413 (1st Cir. 2000) (rejecting Spanish language document because it was not translated into English); Trapaga v. Cent. States Joint Bd. Local 10, 2007 WL 1017855 at *7 (N.D. Ill. 2007).  Furthermore, the documents, at least what can be gleaned from them, do not explain how the expenses they detail relate to investment losses.  "Summary judgment is

'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." Steen v. Meyers, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005)).  MDG's evidence of lost investment and reputation damages is simply inadequate to establish a genuine issue of material fact; Australian Gold's motion as to these claimed damages must therefore be granted.

*B. Damages Arising Directly from Recall Expenses*

Although MDG cannot claim any lost profit damages because the Brazil Recall did not cause the destruction of MDG's joint venture in Brazil, MDG has provided sufficient evidence to create a genuine issue of material fact as to whether Australian Gold fully reimbursed MDG for expenses incurred directly from the Brazil Recall.  Australian Gold credited MDG for $256,446 as a reimbursement for the recall expenses, but MDG never agreed that this amounted to compensation in full.  MDG has submitted evidence of $97,000 of alleged additional expenses: (1) $3,000 for 3,240 units of expired products; (2) $14,000 for 15,312 nearly expired units; (3) $31,000 for 34,000 units held up in customs;[23] and (4) $49,000 for 52,161 units removed from the Brazil market.  Pl.'s Response at 6, 7.  Although Australian Gold disputes any obligation to pay, MDG has

---

[23]Like the delayed products in Mexico, these were eventually sold.  Australian Gold argues that they cannot be counted, but, as with the delays in Mexico, a genuine issue exists as to whether these sales opportunities have been fully credited.

created a genuine issue of material fact as to the amount of money, if any, Australian

Gold owes MDG to cover expenses.  Therefore, insofar as Australian Gold's motion

seeks to foreclose these damages, it is <u>denied</u>.


*C.  MDG's Fraud Claim*

In addition to its breach of contract claims and its claims of damages resulting

from the termination of its relationship with Frajo, MDG has also filed claims of fraud

and constructive fraud relating to Australian Gold's alleged false statements to MDG

about expiration dates on products, based on the following allegations: Because of

requirements in other countries for proper registration of product labels and ingredients,

foreign health agency officials and customers of MDG questioned MDG about the

meaning of numbers and letters displayed on the outside of Australian Gold's bottles.  In

response to these inquiries, MDG asked Australian Gold whether the markings related to

expiration dates.  On June 23, 1997, Australian Gold provided MDG with written

confirmation that these numbers and letters were not expiration dates.  Compl. ¶20.

Furthermore, on March 7, 2002 and June 18, 2002, Australian Gold confirmed in writing

that the letters "EXP" on the outsides of bottles were not related to expiration dates.

Compl. ¶21.  Again, on September 18, 2002, Australian Gold gave MDG written

confirmation that the combinations of numbers and letters on the bottles were not

expiration dates.  Compl. ¶22.  MDG alleges that these products had in fact expired, and

that Australian Gold's misleading statements constituted fraud.

Australian Gold has not made any arguments related to the fraud claims in its

briefing.  Based on the record presently before the Court, there are numerous issues of material fact surrounding MDG's fraud claims.[24]  Thus, insofar as Australian Gold's Motion for Partial Summary Judgment on the Brazil Recall relates to MDG's fraud claims, it is hereby <u>denied</u>.

## VI. Conclusion

Having carefully considered the parties' arguments regarding contract formation, contract performance, and fraud, we hold that Defendant's Motion for Partial Summary Judgment on South Africa and the United Arab Emirates is <u>GRANTED</u>; Defendant's Motion for Partial Summary Judgment on Mexico is <u>DENIED</u>; Defendant's Motion for Partial Summary Judgment on Cruise Ship Sales is <u>GRANTED</u>; and Defendant's Motion for Partial Summary Judgment on the Brazil Recall is <u>GRANTED</u> in part and <u>DENIED</u> in part.

IT IS SO ORDERED.

Dated:  _____03/17/2009_____

Copies to:

Amanda C. Couture
DELANEY & DELANEY
acouture@delaneylaw.net

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

_____

[24]MDG may be entitled to punitive damages for these claims.  <u>Williams v. Younginer</u>, 851 N.E.2d 351, 358 (Ind.Ct.App. 2006).

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Richard A. Kempf
TAFT STETTINIUS & HOLLISTER LLP
rkempf@taftlaw.com

Thomas F. O'Gara
TAFT STETTINIUS & HOLLISTER LLP
togara@taftlaw.com

Peter Jon Prettyman
TAFT STETTINIUS & HOLLISTER LLP
pprettyman@taftlaw.com