UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MDG INTERNATIONAL, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | 1:07-cv-1096-SEB-TAB |
| vs. ) | |
| ) | |
| AUSTRALIAN GOLD, INC., ) | |
| ) | |
| Defendant. ) | |

**ORDER ADDRESSING PENDING MOTIONS**

This cause is before the Court on Defendant, Australian Gold, Inc.'s ("Australian Gold) Motion to Exclude Expert Testimony of Professor James M. Wahlen [Docket No. 152], filed on April 17, 2009; Defendant's Motion for Relief Under 28 U.S.C. § 1927 [Docket No. 154], filed on April 24, 2009; and Defendant's Motion for Oral Argument [Docket No. 166], filed on June 5, 2009.  In its Motion to Exclude, Australian Gold argues that Professor Wahlen's expert report is based on flawed methodology.  In its Motion for Relief, Australian Gold argues that Plaintiff, MDG International, Inc.'s ("MDG") proffer of Professor Wahlen's expert testimony vexatiously multiplied the proceedings and led to a waste of litigation resources.  For the reasons detailed in this entry, Defendant's Motion to Exclude is <u>GRANTED</u>; Defendant's Motion for Relief is <u>DENIED</u>; and Defendant's Motion for Oral Argument is <u>DENIED</u> as moot.

*Factual Background*

Plaintiff MDG is a corporation organized under the laws of Florida with its principal place of business in Florida.  Defendant Australian Gold is a corporation organized under the laws of Indiana with its principal place of business in Indiana.  MDG distributes sun tanning products internationally; Australian Gold manufactures tanning products that it sells through distributors like MDG.  On May 27, 1994, MDG and ETS (the corporate predecessor to Australian Gold) entered into a distributorship agreement ("the Agreement") to which Australian Gold is now a party.[1]

The Agreement granted MDG the exclusive rights to market, distribute, and sell Australian Gold products in defined territories, including South America, Mexico, Puerto Rico, and Central America/Caribbean.  The initial term of the Agreement lasted from September 23, 1993 to December 31, 1994.  Thereafter, the Agreement renewed on an annual basis as to each territory, provided each party performed its part of the contract, including a condition that MDG meet a minimum purchase requirement, or quota, for each territory.  If MDG failed to meet a territorial quota, Australian Gold could terminate MDG's rights in that territory.  Although each party currently maintains that the other has breached the Agreement, they remain business partners.

---

[1] On November 1, 1997, ETS assigned its rights under the agreement to Australian Gold.

## I. *Australian Gold's Purported Terminations of the Agreement*

In November of 2006, Australian Gold sent a letter to MDG, alleging that MDG had failed to fulfill certain territorial quotas, and stating its decision to terminate the Agreement as of December 31, 2006. This letter purported to terminate the entire relationship between the parties. On February 12, 2007, however, Australian Gold wrote to MDG again, agreeing to a one-year extension of the Agreement, all the while maintaining that MDG had failed to meet its quotas in specified territories.

Thereafter, on August 28, 2007, MDG initiated the present lawsuit, claiming that Australian Gold's purported termination constituted a breach of the Agreement. The parties' business relationship continued despite the onset of litigation, but their contractual disputes resurfaced. On January 31, 2008, Australian Gold wrote to MDG, alleging again that MDG had failed to meet its quotas for two of the three territories, Mexico and Central America/Caribbean. In a separate letter, Australian Gold informed MDG of its decision to terminate MDG's distribution rights in those territories.

### A. *Expert Testimony of James Wahlen*

In 2007, after Australian Gold's first purported termination, despite the contract extension, MDG perceived that a threat remained to the Agreement, which comprised the entirety of its business. MDG therefore undertook to value its business through the services of Professor James Wahlen, Ph.D. ("Wahlen"). Wahlen is a professor of accounting and the chairman of the Master's of Business Administration program at the

3

Indiana University Kelley School of Business. Wahlen Expert Rep. at 1. Based on information given to him by MDG's counsel, Wahlen formulated a report outlining his opinions as to the value of MDG's business, based on calculations of MDG's expected overall profits as well as in each territory.

Although MDG did not originally hire Wahlen for litigation purposes, when the parties contractual disputes resurfaced, MDG decided to use his valuation as evidence at trial of the profits MDG would lose as a result of the termination of the Agreement. MDG disclosed its intent to utilize Wahlen as an expert witness, and produced Wahlen's expert report, on December 1, 2008. An amended report was produced on February 9, 2009. Counsel for Australian Gold deposed Wahlen on February 19, 2009. Following the deposition, on March 12, 2009, Richard Kempf ("Kempf"), counsel for Australian Gold, sent a letter to Edward Delaney ("Delaney"), counsel for MDG, asserting that Wahlen's opinions contained numerous deficiencies and requesting that MDG withdraw him as an expert.

On March 17, 2009, the Court issued a ruling granting in part and denying in part Australian Gold's motions for summary judgment. Less than one week later, on March 23, 2009, Delaney sent an email to Kempf, in which he stated that, "given the scope of the complaint and the Court's rulings," he would agree to withdraw portions of Wahlen's opinion on the valuation of MDG's business. However, Delaney also identified the following five topics on which MDG still planned to have Wahlen testify: (1) lost profits

4

in Mexico; (2) lost profits in Puerto Rico; (3) lost sales on product returned from Brazil;[2] (4) lost sales due to sales on Starboard cruise ships;[3] and (5) lost sales from back orders, refusal to provide products, delayed registrations, and other acts.

In the motions before the Court, Australian Gold seeks the exclusion of Wahlen's expert testimony and seeks compensatory relief from MDG's counsel for costs incurred defending against Wahlen's expert report.

### *Legal Analysis*

### I. *Admissibility of Professor Wahlen's Testimony*

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms. Inc. 509 U.S. 579 (1993). Applying this framework, courts must undertake -

> a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education"; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and

---

[2] In 2004, MDG entered into a joint venture for the distribution of Australian Gold products in Brazil, pursuant to its right to distribute those products in South America. In 2006, Australian Gold and MDG recalled certain products from the Brazil market because those products were expired or would soon expire (the "Brazil Recall"). MDG has brought claims for damages allegedly resulting from the Brazil Recall.

[3] During the course of the Australian Gold-MDG business relationship, Australian Gold also had a separate distribution and sales agreement with Starboard Cruise Services, which operates gift shops on cruise liners worldwide, including in the Caribbean Sea. Starboard sells Australian Gold products to ship passengers while the ships are in international waters. Many of these ships dock at the ports of countries inside MDG's exclusive territory.

>the testimony must assist the trier of fact to understand the evidence or determine a fact in issue.

Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir. 2007) (quoting Fed.R.Evid. 702); see also Kumhoe Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) (extending the Daubert admissibility framework to expert testimony in the social sciences).

We first consider whether Wahlen has the expert qualifications necessary to assess the value of a small, closely held business such as MDG. "A court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000). Australian Gold concedes that Professor Wahlen is a "very well credentialed individual," but contends that his qualifications do not extend to the valuation of a closely held business. Def.'s Br. in Supp. at 14-15.

Professor Wahlen's past experience includes the valuation of numerous large public companies. He has testified that he considers himself an expert at such valuations. Dep. of Wahlen at 100. It is this expertise that MDG relies upon in defending Wahlen's qualifications. However, Wahlen equivocated when he was asked whether he considers himself an expert on valuing closely held businesses. Id. He stated that he had never completed a full valuation of a closely held business and even acknowledged expressly that he has no specific prior experience in such matters. Id. at 99-100. Moreover, Wahlen admitted that he was not an expert on evaluating closely held businesses to the

extent that the principles underlying a valuation of a closely held businesses differ from the principles underlying valuations of large, publicly traded companies.  Id. at 100. Although Wahlen's experience is impressive and he arguably could bring "relevant expertise enabling him to offer responsible opinion testimony helpful" to the jury, Tuf Racing Products, Inc. v. American Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000), in the face of his statements that he lacks expertise and experience in the area of valuing closely held businesses, we cannot conclude with any confidence that he qualifies as an expert in that area under Daubert.

Assuming *arguendo* that Wahlen's credentials qualify him to evaluate a closely held business, his proffered opinions fail to withstand scrutiny under the other prongs of Daubert.  A "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in Daubert."  Clark v. Takata Corp., 192 F.3d 750, 759 n.5 (7th Cir. 1999).  Thus, although the Court's role does not include an assessment of the credibility or persuasiveness of the proffered testimony, which factual issues are left for the jury to determine, Deputy v. Lehman Brother's, Inc., 345 F.3d 494, 506 (7th Cir. 2003), the Court, "in its role as a gate-keeper," must nonetheless determine if Wahlen's opinions are based on reliable methodology, and whether they would be helpful to a jury.  Winters v. Fru-Con, Inc., 498 F.3d 734, 743 (7th Cir. 2007).

In challenging Wahlen's methodology and reliability, Australian Gold first

contends that his opinions "rely on incomplete and inaccurate 'cherry-picked' facts." Def.'s Br. in Supp. at 15.  When an expert "ignores critical data" in forming his opinions, he fails to satisfy Daubert.  See LeClerq v. The Lockformer Co., 2005 WL 1162979, at *2 (N.D. Ill. Apr. 28, 2005); Holden Metal & Aluminum Works, Ltd. v. Wismarq Corp., 2003 WL 1797844, at *2 (N.D. Ill. 2003).  Australian Gold argues generally that Wahlen's opinions must be excluded because they rely solely on the information provided to him by counsel for MDG; because he did not review the record in preparing his report; and because he admitted that a review of the record would have impacted his opinions. See Dep. of Wahlen at 26, 29, 33-34.

Australian Gold further contends, more specifically, that Wahlen made a significant methodological error in choosing to ignore the automatic termination provision of the Agreement.  When Wahlen calculated MDG's potential profits, he did not account for the fact that Australian Gold maintained the right to terminate the Agreement if and when MDG failed to meet its established quotas.  Wahlen admitted that ignoring this provision did in fact impair the value of his expert opinions:

> So not knowing what is or is not in that deposition, it's hard for me to say what effect it would have on my valuation on my report. Would it matter, which is your initial question? Of course, it would. Would I consider that? Yes. Of course I would.  I worked off the information given to me.

Dep. of Wahlen at 33.  Wahlen again conceded this error in a later portion of his deposition testimony, stating that he should have considered Australian Gold's termination right in calculating his projections specifically with regard to MDG's

business in Mexico, but that he did not. Dep. of Wahlen at 186-187.[4]

MDG defends Wahlen's opinion by maintaining that he relied on sufficient facts, including an overview provided by MDG's counsel, information gathered in a meeting with Mauricio and Diana Goldring, the owners of MDG, and a review of the Agreement between the parties and MDG's interrogatory answers.  Dep. of Wahlen at 21.  However, this information amounts to only a small fraction of the total data available in the record before the Court.  Moreover, Wahlen's failure to consider the possibility that Australian Gold would and could terminate MDG's rights in any territory makes any opinion he offers on value and lost profits inherently incomplete and thus unreliable to a trier of fact. For this reason alone, the central testimony offered by Wahlen - MDG's lost profits in Mexico and Puerto Rico - is inadmissible.  See, e.g. Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co., 254 F.Supp.2d 1239, 1247 (M.D. Fla. 2003) (excluding an expert opinion on prospective earnings for failure to consider risk that contract at issue was subject to termination).

---

[4]Australian Gold also contends that Wahlen's "income and profitability calculations used improper methodology by excluding reasonable business expenses." Def.'s Br. in Supp. at 20. To calculate MDG's income, Wahlen excluded certain operating expenses he determined were more appropriately identified as income to the Goldrings, not income of the business.  Included in the income he did not use were the cost of company vehicles, contributions to an employee benefit plan and pension plan, expenses for rent, property taxes, repairs to MDG's building, and seventy percent of the Goldrings' travel expenses.  Numerous courts have held that such an error in calculation renders an expert's testimony on profitability inadmissible.  See, e.g. West Haven Sound Dev. Corp. v. West Haven, 514 A.2d 734, 745 (Conn. 1986) (rejecting profit calculation for small, closely held business in contract action that did not deduct wages from revenues); Rogers v. Rogers, 296 N.W.2d 849, 852-53 (Minn. 1980) ("The net income of a corporation . . . should not include the salaries of its employees and officers, except as those salaries may reflect a distribution of profits.").

Australian Gold also contends that Wahlen relied "on assumed 'facts' that he never verified, in contradiction of his own professional methods." Def.'s Br. in Supp. at 15. An expert must independently verify facts given to him, rather than "accepting [them] at the word of . . . counsel." Lyman v. St. Jude Med. S.C., Inc., 580 F.Supp.2d 719, 726 (E.D. Wis. 2008) (excluding expert testimony where expert failed to verify the reliability of data given to him by counsel). Furthermore, an expert's opinions must be based on the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions must be supported by evidence. See Elcock v. Kmart Corp., 233 F.3d 734, 756 (3d Cir. 2000) (reversing district court's admission of expert economic damages testimony relying on empirical assumptions unsupported by the record); Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 6 (1st Cir. 1992) (affirming district court's exclusion of expert economic damages testimony "predicated on an assumption not supported by the record").

In calculating MDG's lost profits in Puerto Rico stemming from the termination of its distribution rights there, which is evidence MDG intends to introduce to show damages, Wahlen made one such faulty assumption. He assumed that Walgreen's and Travel Traders stores, to which MDG distributed Australian Gold products in Puerto Rico, used a 33% markup on the products when they resold them to their customers. Contrary to Wahlen's assumption, however, Travel Traders's actual markup always exceeded 100%, and Walgreen's actual markup exceeded 75%. Dep. of Wahlen at 143, 147. Although information detailing these actual markups was available to MDG's

counsel and to Wahlen, Wahlen never independently verified the basis for the assumptions he made. He acknowledged that, had he based his calculation on the actual markup percentage, the result of his lost profits calculation would have been substantially lower. Dep. of Wahlen at 145.

This was not Wahlen's only faulty assumption, it seems. In a separate portion of his opinion, Wahlen assumed that MDG's Mexico sales would grow by 10% each year. However, the evidence available to him showed that, from 2004 to 2007, MDG's sales never increased by more than 4%. See Dep. of Wahlen at 185-186. Again, Wahlen failed to substantiate the basis for his opinion. Australian Gold argues that these assumptions and others like them render Wahlen's conclusions unreliable. See LeClerq, 2005 WL 1162979, at *2.

MDG rejoins that the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." McArthy-Shreve v. Wal-Mart Stores, Inc., 2008 U.S. Dist. LEXIS 61997, at *3 (S.D. Ind. July 23, 2008) (quoting Smith, 215 F.3d at 718). However, MDG's reliance on McArthy-Shreve is misplaced. Whereas the expert in McArthy-Shreve verified the data underlying his opinion, Wahlen did not independently review any of the key data underlying his valuation of MDG's business, including invoices, expenses, payables, and receivables, in order to verify MDG's historical financial performance. See Dep. of Wahlen at 60-61, 33-34, 49-50. Wahlen's assumptions were not supported by evidence, but were, in fact, controverted by the facts

available to him.[5]  This failure renders his opinions inadmissible.  See Elcock, 233 F.3d at 756.

The fact that Wahlen failed to verify the data he used in this case is significant for the additional reason that, according to him, verifying such data is his standard practice. Dep. of Wahlen at 61-65.  The Seventh Circuit has found expert testimony to be inadmissible when the expert "conceded that he did not employ the methodology that experts in valuation find essential."  Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 186 (7th Cir. 1993).  The court in Frymire excluded the report of an expert who did not follow his normal professional practice of examining the client's business thoroughly before relying on that client's data.  Id.  Wahlen admits that he accepted facts at face value as given to him by MDG, explaining that he did not deem it necessary to verify those facts because his opinion was never intended for use by a third party, only as an internal valuation prior to the onset of litigation.  Dep. of Wahlen at 61, 64.[6]

"Social science testimony . . . must be tested to be sure that the person possesses genuine expertise in a field and that his court testimony 'adheres to the same standards of intellectual rigor that are demanded in [his] professional work.'"  Tyus v. Urban Search

---

[5]According to MDG, "revising the calculations to reflect a different markup would be a relatively simple mathematical task."  Pl.'s Response at 16.  However, this rejoinder does not negate the fundamental errors found in Wahlen's opinions.  To the contrary, it serves as a clear admission that such errors exist.

[6]On Wahlen's own assessment, his opinions were never meant to be helpful to a third party, like a jury: "I didn't do that investigation [to verify underlying data] because I was not advising someone outside the business on what a business unknown to them is worth."  Dep. of Wahlen at 64.

12

Mgmt., 102 F.3d 256, 263 (7th Cir. 1997) (quoting Braun v. Lorillard, Inc., 84 F.3d 230, 234 (7th Cir. 1996)).  Wahlen's report fails to meet this standard because his mistaken assumptions and his failure to verify key facts are errors of methodology that render his resultant opinions unreliable.  Frymire-Brinati, 2 F.3d at 186; Elcock, 233 F.3d at 756.  For all of the foregoing reasons, the central portions of Wahlen's report, relating to his assessment of lost profits in Mexico and Puerto Rico, are inadmissible as expert testimony in the present case.

*A. Additional Problems with Wahlen's Testimony*

The problems discussed thus far plague the central portions of Wahlen's expert testimony, but, as Australian Gold is quick to point out, numerous other deficiencies render the remaining portions of his report inadmissible as well.

Australian Gold contends, first, that Wahlen cannot testify to opinions on damages resulting from alleged fraud and lost sales in Brazil because Wahlen's report contained no opinion(s) related to those damages.  MDG offers nothing to refute this challenge.  "The purpose of the [expert] report is to 'set forth the substance of the direct examination.'"  Jenkins v. Bartlett, 487 F.3d 482, 487 (7th Cir. 2007) (quoting Fed.R.Civ.P. 26 advisory committee note).  "This means that the report should include whatever information the proponent will seek to elicit from the expert on the witness stand."  Watts v. Cypress Hill, 2008 WL 697356, at *2 (N.D. Ill. Mar. 12, 2008).  Because Wahlen's report did not mention damages arising from the Brazil recall, his opinions on that subject are indeed

13

inadmissible.

Finally, Australian Gold mounts two challenges to Wahlen's opinion on lost profits arising from sales made on Starboard cruise ships.  First, Australian Gold claims that the Court's summary judgment ruling made cruise ship sales irrelevant, which would make testimony about them inadmissible.  See Daubert, 509 U.S. at 591.  Although Australian Gold is correct in stating that the Court entered judgment against MDG on its claim for damages from cruise ship sales, the Court also held that the issue of whether or not cruise ship sales constituted a breach of contract "is separate from the issue of whether the Australian Gold-Starboard relationship was significant enough to meaningfully impair MDG's ability to meet the quota."  Order Addressing Motions for Summary Judgment [Docket No. 136], at 16.  Therefore, evidence on the impact of cruise ship sales on profitability in Mexico, which is the subject of Wahlen's opinion in this area, remains relevant.

Although Australian Gold misconstrues the relevance of the testimony, it posits an alternative basis for its exclusion that is more convincing.  When Wahlen calculated potential lost profits based on the interruption in Mexico sales caused by competing cruise ship sales, he based that calculation on Starboard's worldwide sales.  However, the only Starboard cruise sales that might have had an impact were its Caribbean sales.  Thus, Wahlen's calculations in this regard would be misleading to a jury to a point that they must be deemed inadmissible.  See Ervin, 492 F.3d at 904.

Because each proffered portion of Wahlen's report contains errors rendering it

inadmissible, his report in its entirety must be excluded.  Accordingly, Defendant's Motion to Exclude is granted.

## II.  *Defendant's § 1927 Motion*

Australian Gold also seeks relief against MDG under Title 28, United States Code § 1927, alleging that "MDG's attorneys *knew* that Prof. Wahlen's valuation opinion was irrelevant to this litigation, yet they tendered that opinion anyway."  Def.'s Br. in Supp. at 8.  Under § 1927, an attorney who "multiplies the proceedings in any cause unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927; see also IDS Life Ins. Co. v. Royal Alliance Assoc., Inc., 266 F.3d 645, 654 (7th Cir. 2001).  Courts have -

> discretion to impose § 1927 sanctions when an attorney has acted in an objectively unreasonable manner by engaging in serious and studied disregard for the orderly process of justice; pursued a claim that is without a plausible legal or factual basis and lacking in justification; or pursue[d] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound.

Jolly Group, Ltd. v. Medline Indus., Inc., 435 F.3d 717, 720 (7th Cir. 2006) (internal citations omitted).

Australian Gold outlines MDG's counsel's wrongdoing based on the following chronology: (1) MDG obtained Wahlen's opinion on valuation before filing the present lawsuit; (2) MDG filed its lawsuit, and subsequently tendered Wahlen's report and

15

amended report; (3) On March 12, 2009, following the deposition of Wahlen, Australian Gold's attorney sent a letter to MDG's attorney, Edward DeLaney, requesting that MDG withdraw Wahlen's opinion for alleged deficiencies; and (4) On March 23, 2009, Delaney responded to that letter by purportedly limiting Wahlen's testimony "given the scope of the complaint and the Court's rulings."  Email from Edward DeLaney to Richard Kempf.

Australian Gold alleges that, when DeLaney admitted that Wahlen's opinion went "beyond the scope of the complaint," he admitted that the offer of the report had been a knowing waste of litigation resources.  With its motion, Australian Gold thus seeks compensation for "thousands of dollars in attorneys' fees, expert fees, and expenses in defending itself against Prof. Wahlen's admittedly irrelevant valuation opinion prior to the time it was withdrawn."  Def.'s Br. in Supp. at 4.

In order for Australian Gold to obtain relief under § 1927, it must show that MDG's counsel knowingly behaved unreasonably, acted without justification, or engaged in "serious and studied disregard for the orderly process of justice."  Jolly Group, 435 F.3d at 720.  MDG's counsel, Edward DeLaney, responds to Australian Gold's allegations by providing a justification for his actions, which Australian Gold has failed to refute.  According to DeLaney, MDG originally "undertook to value its business through the services of Prof. James Wahlen" because of Australian Gold's February 12, 2007, threat to terminate the Agreement.  Pl.'s Reponse at 3.  Wahlen's valuation was, at that time, intended to provide MDG with information should it choose to sell its business; it was not intended to be a part of the litigation, which was instituted on August 28, 2007.

16

However, when, on January 31, 2008, Australian Gold renewed its threat to MDG's interests under the Agreement by informing MDG of its intent to terminate two of MDG's territories, Mexico and Central America/Caribbean, MDG feared the "possibility that a similar claim would be made" as to the third territory. From DeLaney's perspective, this made Wahlen's valuation of the entire company relevant to the suit as evidence of lost profits and damages. Pl.'s Response at 4. As DeLaney explains, "factual developments during the life of this case made the valuation issue relevant for trial as well as a matter for discussion in the course of repeated settlement talks." Id. DeLaney also "believed that [Wahlen's] valuation evidence as to the enterprise as a whole would underpin [MDG's] claims for losses in Brazil." Id. at 5.

DeLaney states that he only reconsidered the usefulness of Wahlen's opinions after the Court's ruling of March 17, 2009, which foreclosed some of MDG's claims, including MDG's claim for economic damages in Brazil. On March 23, 2009, when DeLaney responded to Australian Gold's request that MDG withdraw Wahlen's report, he accounted for the Court's ruling, and concluded that portions of Wahlen's "expert testimony as to the lost value of the business had become less important and more confusing and expensive in light of the present status of the case." Id. According to DeLaney, "[v]aluation as to the whole business, while once clearly relevant as to the overall threat to our business, was simply less needed in light of the latest developments." Id. at 6-7.

"In short," DeLaney insists, "if Australian Gold . . . had not threatened to cancel

the entirety of the business, and/or substantial parts thereof, valuation of the business might not have been a logical issue for trial." Id. at 7.  Australian Gold has not offered any convincing evidence undermining Delaney's explanation for the manner in which he managed MDG's proffer of the Wahlen report.  Certainly, Australian Gold has failed to show that Delaney knowingly acted unreasonably or without justification, or that he engaged in "serious and studied disregard for the orderly process of justice."  Jolly Group, 435 F.3d at 720.  Accordingly, Australian Gold's Motion for Relief under § 1927 must be denied.

### III.  *Motion for Oral Argument*

Having resolved all issues fully before the Court without necessity of a hearing, Defendant's Motion for Oral Argument is moot, and shall be denied as such.

### IV.  *Conclusion*

Having carefully considered the parties' arguments regarding the admissibility of Professor Wahlen's report, we conclude that his testimony fails to meet the standards set out in Daubert and Rule 702 of the Federal Rules of Evidence and is therefore inadmissible.  However, Australian Gold has failed to establish that it is entitled to relief under 28 U.S.C. § 1927.  Accordingly, Defendant's Motion to Exclude is GRANTED; Defendant's Motion for Relief is DENIED; and Defendant's Motion for Oral Argument is DENIED.

IT IS SO ORDERED.

Dated: __06/29/2009__

Copies to:

Amanda C. Couture
DELANEY & DELANEY
acouture@delaneylaw.net

Edward O'Donnell DeLaney
DELANEY & DELANEY LLC
ed@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Richard A. Kempf
TAFT STETTINIUS & HOLLISTER LLP
rkempf@taftlaw.com

Thomas F. O'Gara
TAFT STETTINIUS & HOLLISTER LLP
togara@taftlaw.com

Peter Jon Prettyman
TAFT STETTINIUS & HOLLISTER LLP
pprettyman@taftlaw.com

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana